**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| WILLIAM GLIVA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 10-CV-818 |
| ) | |
| PIEDMONT PLASTICS, INC., ) | |
| ) | |
| Defendant. ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

MARVIN E. ASPEN, District Judge:

Plaintiff William Gliva is a former employee of Defendant Piedmont Plastics, Inc.

("PPI"). Gliva claims that PPI violated the Age Discrimination in Employment Act ("ADEA"),

29 U.S.C. § 621 *et seq*, when it terminated Gliva from his position as a Films Specialist.[1] He

filed a charge of discrimination with the EEOC on February 4, 2009, and filed the instant action

on February 5, 2010.

Presently before us are two motions. The first motion, brought by PPI, is a motion for

summary judgment. For the reasons set forth below, we grant PPI's motion. The second motion,

brought by Gliva, is a motion for partial summary judgment on PPI's affirmative defenses. As

---

[1] The original action also included a claim that PPI violated Section 510 of the Employee Retirement Income Security Act of 1974. 29 U.S.C. § 1140. However, Gliva does not contest dismissal of this claim. (Resp. at 1.) We therefore dismiss Count II of Gliva's complaint.

the affirmative defenses are not considered in our decision to grant summary judgment, we have no reason to reach the issues presented in Gliva's motion and dismiss it as moot.[2]

**BACKGROUND**

PPI sells plastic sheet rods, tubes, and films in North America. Gliva worked in the Film Group, which specializes in the conversion and sale of thin gauge plastic films utilized in various manufacturing and printing settings. (Def.'s Stat. ¶ 2.) Prior to January 2009, the Film Group had three facilities: Midwest Film (in Wheeling, Illinois), Northeast Film (in Charlton, Massachusetts), and Charlotte Film (in Charlotte, North Carolina). (*Id.* ¶ 6.)

Since January 2004, Pete Dixon has been the general manager of the Film Group and responsible for the Group's profitability. (*Id.* ¶ 7.) Dixon hired Gliva to work at Midwest Films in March 2004 as a Film Specialist—essentially an outside salesman. (*Id.* ¶ 12.) Gliva was 56 years old when he was hired. (*Id.* ¶ 12.) In this position, Gliva was expected to make sales calls and appointments, develop a list of target customers, close a certain number of targets per year, continue the relationship with existing customers, and meet annual sales numbers. (*Id.* ¶ 13.) Gliva ultimately reported to Dixon during his entire career with PPI. (*Id.* ¶ 12.)

---

[2] Gliva also filed Rule 72(a) objections to the Magistrate's Report and Recommendation. Many of the objections refer to evidence Gliva would like to present to refute PPI's affirmative defenses, and we again have no reason to reach those issues. To the extent that the Magistrate's Report and Recommendation addresses evidentiary issues concerning PPI's motion for summary judgment, we adopt the Magistrate's Recommendation and agree that many of Gliva's assertions were improperly included as responses when they should have been included in Plaintiff's Statement of Additional Facts. *See* L.R. 56.1(b)(3)(C). Nonetheless, to ensure a just outcome and per Gliva's request in his Rule 72(a) objections to the recommendation, we did review the parts of the record cited by Gliva in his Response to Defendant's 56.1 Statement of Undisputed Facts. The facts relied upon in the remainder of this opinion are those that have been admitted or not properly denied. We indicate disputes over material facts as necessary. To the extent that statements made by Plaintiff in a response are included in this opinion, we believe it is consistent with our discretion, and such inclusion represents our ruling on the motion to strike.

From the date of his hire until late 2007, Gliva served as the outside salesman over a geographic territory including Michigan, Ohio, Indiana, Wisconsin, Minnesota, Iowa, and Missouri. (*Id*. ¶ 14.) The parties agree that this Midwest territory has the first or second largest potential for film business in the country. (*Id*.) As an outside sales person, Gliva was expected to close ten targets and $500,000 in targeted business per year. (*Id*. ¶ 16.) Gliva agreed that these numbers were given to him as guidelines, but felt that they were "aspirational," not minimum requirements. (Pl.'s Resp. to Def.'s Stat. ¶ 16.) The parties dispute the precise number of outgoing telephone calls and in-person appointments that an outside salesperson is expected to make each month; the numbers presented range for 40 to 55 of each, calls and appointments, per month. (Def.'s Stat. ¶ 17.) Salespersons were also expected to use Goldmine Contact Management ("Goldmine") to track accounts and to allow supervisors to monitor the activities. (*Id*. ¶ 18.) Gliva understood that he was required to use Goldmine and that supervisors might only learn of his performance based on Goldmine reports. (*Id*. ¶¶ 19–20.)

*i. Formal Performance Reviews: 2005–2007*

Roughly once a year, PPI formally reviews employee performance and provides each employee with grades and feedback; employees are given a copy of each review and an opportunity to respond. (*Id*. ¶ 21.) In Gliva's review covering the period from March 2004 to March 2005, Tyler Booth, Gliva's then direct supervisor, rated Gliva at 6.76: Good.[3] (Gliva Dep. Ex. 18 at 1, 9.) The review contained ratings in different categories ranging from 5.5 to 8. (*Id*.) With respect to Gliva's appointment activities, T. Booth wrote that he "would still like to

―――――――――――――

[3] The Performance Reviews contain the following definitions of performance ratings: 9–10: Outstanding; 7–8: Very Good; 5–6: Good; 3–4: Needs Improvement; 1–2: Unsatisfactory. (Gliva Dep. Ex. 18 at 1.)

see some more appointments, especially when you are in the Chicago area." (Def.'s Stat. ¶ 23.)

The report also indicated that Gliva successfully closed five accounts, while the corporate

average was eight and the goal was 10–15. T. Booth explained that he rated Gliva a 7 in this

category "due to recent activity over the last 6 months," also noting that Gliva's targets were

well thought out and realistic. (*Id*. ¶ 24; Gliva Dep. Ex. 18 at 2.) In a summary of the review, T.

Booth wrote that Gliva's appointment activity needed to increase and that closing ten targets

would put him "on pace." (Gliva Dep. Ex. 18 at 7.) Finally, the review included a list of job

expectations. The documents indicates that Film Specialist should close a minimum of $500,000

in targeted business annually and make 55 calls per month, though Dixon clarified that the

number should actually be 50 calls per month. (*Id*. at 8; Dixon Dep. at 52.)

T. Booth also reviewed Gliva's performance during the period from April 2005 to May

2006. (Def.'s Stat. ¶ 27.) Gliva received an overall rating of 6.47: Meets Expectations.[4] (Gliva

Dep. Ex. 19 at 7.) During that period, Gliva averaged 36 appointments per month, below the 40

to 50 per month goal, but in line with the other Film Specialists who averaged between 25 to 49

appointments per month. Gliva also averaged 72 activities per month, while the Film Specialist

average was 94 activities per month and individual salespersons numbers ranged from 61 to 187

activities per month. (Def.'s Stat. ¶ 28; Gliva Dep. Ex. 19 at 1.) Although he had been expected

to close ten targets during this review period, Gliva did not close any targets and was rated 4.5 in

the related category. (Def.'s Stat. ¶ 32; Gliva Dep. Ex. 19 at 2.) In three separate locations on

---

[4] For the 2006 review, PPI changed its definitions of performance ratings as follows: 9–10: Outstanding; 7–8: Exceeds Expectations; 5–6: Meets Expectations; 3–4: Below Expectations; 1–2: Unsatisfactory. (Gliva Dep. Ex. 19 at 1.)

the review, T. Booth indicated that Gliva needed to build his customer base. (Gliva Dep. Ex. 19 at 1–2, 5.) Booth wrote in the review summary that Gliva should close ten target accounts and complete 40 plus appointments per month during the following year. (Def.'s Stat. ¶ 33.)

In December 2007, Campo, who was then acting as Gliva's direct supervisor, reviewed Gliva's performance for the period November 2006 through October 2007. (*Id.* ¶ 34.) Gliva received a total score of 67.5: Meets Requirements.[5] (Gliva Dep. Ex. 20 at 4.) The review indicates that Gliva closed three targets during the period, below the corporate average of nine, and earned a rating of 2 in the related category. (Def.'s Stat. ¶ 35; Gliva Dep. Ex. 20 at 3.) He also earned a 2 in the categories of "Timeliness" and "Target Manager Information Quality," seemingly based on his inadequate use of Goldmine, as well as in the category of "Appointment Activity." (Gliva Dep. Ex. 20 at 1–3.) The review again pointed out deficience in Gliva's ability to grow the base. With respect to closing new business, Campo rated Gliva a 1, explaining that "Bill needs to close 10 targets this year. I made it clear to Bill." (*Id.* at 2.) Under the "quality of work" category, Campo rated Gliva a 2.5, indicating that "Bill needs to focus to grow territory and close targets this year." (*Id.* at 1.) Again, under the heading "Opportunity for Development," Campo wrote, "Bill needs to focus on new markets and opening up new accounts, and close 10 targets min[imum]." (*Id.* at 4.) The specific goals listed for the following year were to close 10 targets, increase the number of unique customers, and widen the territory to close new accounts. (Def.'s Stat. ¶ 42; Gliva Dep. Ex. 20 at 4.)

---

[5] The review system changed again for this review period and used the following scale: 5: Exceptional; 4: Outstanding; 3: Meets Expectations; 2: Change Required; 1: Unacceptable. (Gliva Dep. Ex. 20 at 1.) The rating system for the total score was as follows: 92–115: Exceptional; 69–91: Outstanding; 46–68: Meets Requirements; 23–45: Change Required; 0–22: Unacceptable. (Gliva Dep. Ex. 20 at 4.)

*ii.  Informal Performance Reviews: 2007–2008*

Based on a print out of Gliva's outside calls, PPI asserts that between November 2007 and November 2008, Gliva never made more than 13 calls per month, despite admitting that he was asked to make over 40 calls per month.  (Gliva Dep. Ex. 30.)  Gliva argues, however, that the numbers on the report are not accurate due to computer troubles, and he asserts that his managers were aware of this problem.

In Summer or Fall of 2008, Dixon accompanied Gliva on a sales trip through parts of Wisconsin.  Dixon stated that Gliva kept his car messy, appeared disorganized, and seemed to have done little to plan for the trip—leading him to feel that he needed to take immediate action to improve Gliva's performance.  Gliva disputes the statements about the trip: he claims that his car was clean, that he was organized, and that he had planned every aspect of the trip.  (Def.'s Stat. ¶ 45; Pl.'s Resp. to Def.'s Stat. ¶ 45.)

Gliva met with Campo on October 10, 2008; the meeting was memorialized on a memorandum sent by Campo to Gliva on October 13, 2008.  The memorandum explained that the meeting was necessary "[a]s a result of your performance over the past 10 months."  According to the memorandum, the discussion at the meeting addressed improvements Gliva needed to make to meet his job expectations and "to help insure the profitable future of Piedmont Film Group, Wheeling."  (Dixon Dep. Ex. 32.)  Campo outlined a number of areas that needed "immediate improvement," including: closing ten targets per year to equal a minimum of $500,00 in sales, generating five new accounts per month, updating Goldmine, and making 50 appointments per month.  (*Id*.)  Gliva described the meeting as a "let's pick up the pace" type

meeting, emphasizing that Campo never mentioned termination during the discussion. (Pl.'s Resp. to Def.'s Stat. ¶ 47.)

Gliva also met with Dixon and Campo on October 20, 2008. Dixon documented the meeting in a followup email that Gliva asserts he never received. (Def.'s Stat. ¶ 48; Pl.'s Resp. to Def.'s Stat. ¶ 48.) In the meeting, Dixon stressed that Gliva needed to do a better job with Goldmine and call more customers; Gliva acknowledged during his deposition that after this meeting he knew that he needed to improve and get it straightened out quickly. (Def.'s Stat. ¶ 48.)

### iii. The Film Group's Finances and Decision to Terminate Gliva

The Film Group became a separate division, subject to separate profit and loss accounting, in 2006. (Def.'s Stat. ¶ 57.) PPI expected that it would take time for this new division to become profitable, but asserts that it performed worse than expected: by the close of fiscal year 2008, the Film Group had lost over two million dollars. (*Id*. ¶ 58.)

While there is evidence that Hank Booth, PPI's then president, discussed the need to cut expenses in the Film Group as early as September 2008, there is no evidence that he or anyone else informed Dixon until December 2008. H. Booth and Dixon both testified that they had a discussion about cutting expenses in early December 2008. (Dixon Dep. at 188 ("I'm going to say early December, when we were doing a budget review."); H. Booth Dec. ¶ 10 ("During a budget meeting around the beginning of December 2008, I told Pete Dixon . . . that the Film Group needed to cut expenses.").) Gliva, on the other hand, only cites H. Booth's deposition testimony indicating that H. Booth informed Dixon of the concerns in "September or after

2008." (H. Booth Dep. at 26.) Therefore, we are left with the undisputed statement that Dixon was first told to cut expenses in early-December 2008.[6]

After the directive was given, H. Booth gave Dixon discretion to determine the manner in which expenses were to be reduced; however, as 60% of expenses came from employee costs, it was clear that some employees needed to be terminated. (Def.'s Stat. ¶ 61.) On December 16, 2008, Dixon sent a memorandum to Suzanne Awn, PPI's Human Resources Director, explaining that management had made the decision to close Northeast Films and to reduce the work force at Midwest Films. The memorandum indicated that PPI would terminate four employees from Northeast Films and two employees from Midwest Films: Gliva and Jamie Gelshecker, a Machine Operator. (Dixon Dep. Ex. 37 at 2.) Gliva was officially terminated on January 12, 2009. (Def.'s Stat. ¶ 1.)

**ANALYSIS**

The ADEA prohibits employers from engaging in discrimination on the basis of an employee's age. 29 U.S.C. § 623(a)(1). An employee may establish age discrimination under the ADEA using the direct or indirect method. "In either case, the bottom line question is whether the plaintiff has proved intentional discrimination." *Martino v. MCI Commc'ns Serv., Inc.*, 574 F.3d 447, 452 (7th Cir. 2009) (citing *Olson v. Northern FS. Inc.*, 387 F.3d 632, 635 (7th Cir. 2004)).

As a preliminary matter, Gliva's burden is increased because the decision to terminate his employment was made by Dixon, age 67—six years older than Gliva. *See Richter v.*

---

[6] As the Magistrate Judge correctly explained, Gliva's response to Defendant's Statement of Fact fails to cite to the record, and allowing him to amend his response with the citation provided in his response to the motion to strike would not cure the defect.

*Hook-SupeRx, Inc.*, 142 F.3d 1024, 1032 (7th Cir. 1998) ("While not dispositive, this Court has found it significant that individuals alleged to have discriminated on the basis of age were themselves members of the protected class."). Dixon also was responsible for hiring Gliva, then 56, only four years prior. *Martino*, 574 F.3d at 454–55 ("Common sense tells us that it's unlikely for a person to suddenly develop a strong bias against older folks."). Standing alone, this is not enough to win summary judgment. Nonetheless, it must be considered as part of our analysis.

## I. Direct Method

Under the direct method, a plaintiff may show through either direct or circumstantial evidence that "the employer's decision to take the adverse job action was motivated by an impermissible purpose." *Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 529 (7th Cir. 2003); *see Phelan v. Cook Cty.*, 463 F.3d 773, 779–80 (7th Cir. 2006). Direct evidence of discrimination is evidence that would show a clear acknowledgment of discriminatory intent by the employer. *See, e.g., Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 783 (7th Cir. 2004) (explaining that direct evidence is an "outright admission by the decisionmaker that the challenged action was undertaken because of the [employee's] race"). "Direct proof of discrimination is not limited to near-admissions by the employer that its decisions were based on a proscribed criterion," however, and may include "circumstantial evidence which suggests discrimination albeit through a longer chain of inferences." *Luks v. Baxter Healthcare Corp.*, 67 F.3d 1049, 1052 (7th Cir. 2006); *Hasan v. Foley & Lardner LLP*, 552 F.3d 520, 527 (7th Cir. 2009).

Thus, Gliva may succeed under the direct method by presenting circumstantial evidence that sets out a "convincing mosaic of discrimination," *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994), from which a jury may reasonably infer intentional discrimination. *Luks*, 67 F.3d at 1053 (observing that even if evidence is not a "convincingly rich mosaic . . . it is enough that the circumstances give rise to a reasonable and straightforward inference" of discrimination); *see also Silverman*, 637 F.3d at 733–34; *Sylvester v. SOS Children's Vills. Ill., Inc.*, 453 F.3d 900, 903–04 (7th Cir. 2006); *Volovsek v. Wis. Dep't of Agric., Trade & Cons. Prot.*, 344 F.3d 680, 689 (7th Cir. 2003). In *Volovsek*, the Seventh Circuit reiterated that such circumstantial evidence typically includes:

> (1) suspicious timing, ambiguous statements, behavior towards other employees and so on; (2) evidence, but not necessarily rigorous statistical evidence, that similarly situated employees were treated differently; or (3) evidence that the employee was [adequately performing] the [job in question] and [yet disciplined] and the employer's reason for the difference in treatment is a pretext for discrimination.

*Id.* at 689–90 (citing *Troupe*, 20 F.3d at 736). These three forms of circumstantial evidence can be used independently or in the aggregate to "provide a basis for drawing an inference of intentional discrimination." *Troupe*, 20 F.3d at 736; *Coleman v. Donahoe*, —F.3d—, 2012 WL 32062, at *19 (7th Cir. Jan. 6, 2012); *see Darchak v. City of Chi. Bd. of Educ.*, 580 F.3d 622, 632 (7th Cir. 2009) (noting that the mosaic need not be "rich and varied" so long as "what evidence there is adds up to discriminatory intent").

Here, Gliva relies on three separate discussions with PPI decision makers to show that he has evidence of suspicious timing sufficient to demonstrate discrimination. First, he testified that both Dixon and Campo twice asked Gliva about his retirement plans in the summer and fall

of 2008.[7]  He believes that at least one of these discussions was directly after Dixon learned that the Film Group needed to cut expenses and that Brian Malik wanted to work there.  However, Dixon was not informed that the group needed to reduce expenses until December 2008.  (*See supra* at 7.)  And while true that Malik was interviewing for a job in Fall 2008, there is no indication that Malik and Gliva were competing for a job.  Therefore, there is nothing suspicious about the timing of these alleged discussions.

Second, Gliva alleges that his two performance review meetings in October 2008 were suspiciously timed because they were very close together and they were close in time to Malik's visit to PPI for his final interview.[8]  PPI explains that the reviews occurred in October because it was nearing the end of PPI's fiscal year, "a perfectly appropriate time to stress that PPI needed new customers."  (Reply at 7.)  Even ignoring this seemingly logical explanation, there is nothing suspicious about conducting an employment review while conducting interviews for a similar position—as Gliva points out, PPI invited only Malik to interview, it was not conducting a broad search to increase the number of outside sales representatives.  Gliva also fails to show

---

[7] Gliva does not clearly allege that these inquiries were so persistent or coercive in nature such that they might give rise to a reasonable basis of discrimination on their own.  *See Goodpaster v. Materials Handling Equip. Corp.,* 09 cv 59*,* 2010 WL 4363183 at *5 (N.D. Ind. Oct. 27, 2010) (citing *Kaniff v. Allstate Ins. Co.*, 121 F.3d 258, 263 (7th Cir. 1997)).  Nonetheless, we agree with PPI that the evidence indicates that the inquiries were typically raised during polite conversation—at least one of these discussions appears to have been in reference to building a retirement home and possibly trying to stir up business for a son who builds log cabins.  As such, they do not lead to a direct inference of discrimination.

[8] Gliva would also like us to find these meetings to be evidence of discrimination because he had only received relatively positive reviews prior to this time.  However, the evidence is clear that the prior reviews were not those of a perfect employee, and he does not explain why it is inherently suspicious to receive a negative review three months before being terminated.  Therefore, we do not find any reason why this timing should be considered circumstantial evidence of age discrimination.

that it is suspicious to conduct two separate reviews, stressing very similar performance critiques, much less that there could be a straightforward inference to age discrimination. We thus find that this is not circumstantial evidence of age discrimination.[9]

Finally, Gliva implores us to find that the timing of his new performance goals is suspicious. Specifically, he believes that Campo gave him more difficult performance goals in October 2008 in an effort to orchestrate his termination. (Resp. at 4.) Gliva asserts that it was clear that he would not meet these goals, especially without selling in Wisconsin (which became Malik's territory). In addition, he argues that he was told to spend the last two weeks of December updating Goldmine so that he would not have time to reach 50 calls and so that Campo could collect the data before he was terminated. The major problem with this argument, is that the goals set at the October meetings were not "much harder" than previous goals. In his 2007 review, Gliva was told he needed to close ten accounts in 2008 and that he should focus on new markets and opening new accounts. His 2006 review also indicated that he should be making 40–50 calls per month, and the Film Specialist job description attached to the 2005 review indicates that employees in his position should close a minimum of $500,000 in targeted business annually. Emphasis on Goldmine was a part of the previous reviews as well. While a change in Gliva's geographic territory and an insistence that he meet previously explained company expectations related to Goldmine may have made these goals harder to achieve, there is no indication that the changes were made for discriminatory reasons. Instead, there is significant

---

[9] Gliva separately asserts the Malik was interviewing for the position vacated by David Yarrows, age 51, who was terminated eight months earlier. While there is a dispute over the reason for Yarrow's termination, simply stating that he was fired 8 months before a review meeting does not give rise to an inference of discrimination.

evidence that they were instituted for sound business reasons. As such, the renewed emphasis on performance goals in October 2008 cannot lead to an inference of age discrimination.

Outside of suspicious timing, Gliva presents two other arguments to demonstrate age discrimination using the direct method. First, Gliva relies on Yarrow's termination to demonstrate "the Film Group's pattern of clear preference for younger sales employees." (Resp. at 5.) Gliva is essentially asking us to infer that because two older workers were terminated, PPI must be biased against older workers. Indeed, Yarrows was replaced by a younger employee, Malik (age 36). However, "[b]ecause the occurrence of adverse employment actions may correlate to older employees for reasons other than intentional discrimination, causation is suggested only when the other variables are shown to be insignificant." *Radue v. Kimberly-Clark Corp.,* 219 F3d 612, 616 (7th Cir. 2000) (citing *Furr v. Seagate Tech., Inc.*, 82 F.3d 980, 987 (10th Cir. 1996)). Here, Gliva has not demonstrated that other variables were insignificant, nor has he demonstrated that he and Yarrows were similarly situated with respect to performance and qualifications or that Yarrows was terminated as part of the same RIF. *See Hemsworth v. Quotesmith.Com, Inc*., 476 F.3d 487, 491 (7th Cir. 2007) (To rely on statistics to infer discrimination, "the statistics must . . . include only other employees who were similarly situated with respect to performance, qualifications, and conduct; . . . and the treatment of the other employees must have occurred during the same [reduction in force ("RIF")] as when the plaintiff was discharged." (citing *Balderston v. Fairbanks Morse*, 328 F.3d 309, 320 (7th Cir. 2003))). We acknowledge a factual dispute about the reason for Yarrow's termination—PPI asserts that Yarrows was terminated in February 2008, less than six months after he was hired and 11 months prior to Gliva's termination, because he had made virtually no sales to new

customers—but even assuming he was laid off due to financial constraints, there is no evidence

that age was a factor in the decision or that performance factors were not the impetus for the

decision.  Thus Gliva has not demonstrated a "clear pattern" that could lead to an inference of

discrimination[10]

Finally, Gliva cites to a statement made by Dixon during his deposition:

Q: Now, it's true that Brian Malik, when hired, was not married, right?
A: It's correct.
Q: He had no children, right?
A: Correct.
Q: He had the freedom to go as far as he needed to go and to travel for as long overnight
    as he had to go, right?
A: Yes.
***
Q: [Was it your reasonable belief that he was 36 when he came to work for Piedmont?]
A: Yes.
*Q: And because he was young and because he didn't have the responsibilities that Bill
    [Gliva] had, he had – Malik had the ability to do this very thing by travel, right?*
Mr: Thomas: Objection.  Argumentative.  Mischaracterizes.
Mr. Fuoco: It's true, isn't?
*A: It is True.*

(Dixon Dep. at 229–30.)  Ignoring the objection posed by PPI's counsel, we cannot find that this

is direct or circumstantial evidence of age discrimination merely because Dixon admitted that the

new employee was younger.  This exchange followed Dixon's assertion that Gliva no longer

wanted to travel to Wisconsin, Michigan, and Indiana and that PPI would need to hire someone

to take over that territory.  In this context, the emphasized language shows, at best, that Dixon

---

[10] Gliva also argues that another employee, Dean Clenzi, was laid off eight months after
Gliva and replaced with a younger worker.  However, Gliva neither asserts related facts in a 56.1
Statement, nor establishes facts through citations to the record—the relevant part of his brief
only cites to alleged facts found in Plaintiff's Response to Defendant's 56.1 Statement of Facts,
¶¶ 53, 65.  As such, PPI did not have an opportunity to respond, and we cannot consider Clenzi's
termination as evidence of discrimination.

believed Malik would travel and Gliva would not. As travel is an integral part of the salesperson's position held by Gliva, this is not an unreasonable consideration, nor does it demonstrate age based discrimination.

For these reasons, a reasonable jury could not rely on the direct evidence provided by Gliva to find that PPI's decision was motivated by age based discrimination. We therefore move on to the indirect method of analysis.

## II. Indirect Method

Under the indirect method, Gliva can rely on the burden shifting test first articulated in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973), to prove unlawful discrimination. To do so, Gliva must establish a prima facie case of discrimination. If all of the elements of a prima facie case are established, discrimination is inferred and the burden of production shifts to PPI to raise a legitimate, nondiscriminatory reason for the adverse action. *Naik v. Boehringer Ingelheim Pharm., Inc.*, 627 F.3d 596, 600 (7th Cir. 2010); *Antonetti v. Abbott Labs*, 563 F.3d 587, 591 (7th Cir. 2009). Once a legitimate reason is offered, the inference of discrimination disappears, and Gliva must establish that the offered reason is a pretext for unlawful discrimination. *Naik*, 627 F.3d at 600; *Antonetti*, 563 F.3d at 591.

To establish a prima facie case, Gliva must present proof that: (1) he is a member of a protected class; (2) his job performance met his employer's legitimate expectations; and (3) he suffered an adverse employment action. *See Naik*, 627 F.3d at 599–600; *Martino*, 574 F.3d at 453; *Antonetti*, 563 F.3d at 591; *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 978 (7th Cir. 2004). The parties dispute, however, the final factor required to shift the burden back to PPI. PPI argues that Gliva was terminated as part of a RIF; if true, to meet his burden, Gliva

must show that PPI treated similarly situated, younger employees differently. Gliva, on the other hand, asserts that his termination is better viewed as a mini-RIF, which would require him to show only that younger employees absorbed his former job duties. As summary judgment must be granted for the reasons stated below, we choose not to decide whether this case is best treated as a RIF or mini-RIF.

### I. Prima Facie Case

Under either test, we doubt that a jury could find that Gliva established a prima facie case as he likely was not meeting PPI's expectations. However, we acknowledge the low bar that Gliva is held to at this stage, and do not terminate the case based on this presumed failure. Nonetheless, we address the issues raised by the parties, as they are relevant to the pretext discussion below.

"When considering whether an employee is meeting an employer's legitimate expectations, this court looks to whether [he] was performing adequately at the time of the adverse employment action." *Dear v. Shinseki*, 578 F.3d 605, 610 (7th Cir. 2009) (citing *Hong v. Children's Mem'l Hosp.*, 993 F.2d 1257, 1262 (7th Cir. 1993)). Prior to Gliva's termination, the record reveals that Gliva's performance was slipping and that he was failing to close new business. Dixon testified that "starting in '08 [Gliva] just seemed to be disengaged, [the] quality of his work just went downhill." (Dixon Dep. at 172.) Dixon believed that Gliva had become stuck in a "milk run," calling on the same customers on a continuous basis. (Dixon Dep. at 173.) When asked to explain the basis for his opinion, Dixon explained that the Goldmine system was not kept up to date, that Gliva "did not grow his customer base," and "[a]lthough his top line sales [i.e. total sales] were high, it was all based out of two or three accounts[, and] those two or

three accounts had not returned a sufficient amount of margin for [PPI] to grow the business on." (Dixon Dep. at 177.)  Gliva disputes the final accusation, but he cannot deny that between $1.4 and $1.6 million of his total $2.2 million in sales was derived from his top account.  (Def.'s Stat. ¶ 49.)  Gliva also explained that the salespersons were not given margin requirements, but were instead directed to sell at the best rate they could as long as it was above break-even, and that he was not able to influence the margin paid by his largest account.  (Pl.'s Resp. to Def.'s Stat. ¶ 44; Campo Dep. at 58–59.)

Gliva's reliance on past reviews similarly falls short of proving that he met his employer's current legitimate expectations, because, though relevant, past reviews "cannot 'demonstrate the adequacy of performance at the crucial time when the employment action is taken.'"  *Dear*, 578 F.3d at 610 (quoting *Fortier v. Ameritech Mobile Commc'ns*, 161 F.3d 1106, 1112 (7th Cir. 1998)).  Furthermore, while true that Gliva's overall rating was always good, and he excelled in some areas, he continuously lacked in others.  For example, starting as early as his 2005 performance review, Gliva was instructed that he should close ten accounts per year.  The record indicates that he closed eight accounts in 2005, one account in 2006, and three accounts in 2007.  Seemingly arguing that his sub-par performance was previously considered to be "meeting expectations," he believes that PPI could not legitimately hold him to the ten closings per year requirement now.  The facts do not support this argument.  Each year Gliva was told that he needed to increase his performance in particular areas.  Far from being a silent acquiescence to poor performance, these reviews should have put Gliva on notice that his performance was in fact not meeting expectations.

*ii. Pretext*

We turn now to the pretext analysis as the primary ground for our ruling. Here, PPI proffers that it engaged in a RIF to mitigate economic pressures facing the business and explains that Gliva was included in the RIF due to his poor performance. In doing so, PPI has shifted the burden to Gliva. Thus, Gliva must show that these reasons are pretext. As Gliva has failed to show that the financial situations that led to the Film Group's need to conduct a RIF (or mini-RIF) or the performance concerns that led to Gliva's inclusion in the RIF (or mini-RIF) are not the real reasons that PPI terminated him, he has not met this burden.

In determining whether PPI stated reason is pretext, our only concern is the honesty of the employer's belief. *See Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 419 (7th Cir. 2006). "Pretext is a 'lie, specifically a phony reason for some action.'" *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 737 (7th Cir. 2006) (citing *Russell v. Acme-Evans,Co.*, 51 F.3d 64, 68 (7th Cir. 1995)). "[T]he question in a discrimination case is not whether the employer's stated nondiscriminatory ground for the action of which the plaintiff is complaining is correct but whether it is the true ground of the employer's action rather than being a pretext for a decision based on some other, undisclosed ground." *Id*. at 417. Furthermore, it is not our place to second guess an employer's decision or determine whether the "right" decision was made. "This is because courts are not 'superpersonnel department[s]' charged with determining best business practices." *Stockwell v. City of Harvey*, 597 F.3d 895, 902 (7th Cir. 2010) (citing *Blise v. Antaramian*, 409 F.3d 861, 867 (7th Cir. 2005) (quotation marks and citations omitted)).

Gliva argues that there are "doubtful reasons for [the] RIF." (Resp. at 6–7.)[11] He first asserts that "a cumulative $2 million loss over two years is the realization of exactly what PPI expected to occur." (Resp. at 6.) However, H. Booth clearly stated in his deposition that PPI expected a loss "in the neighborhood of maybe a quarter million dollars a year." (H. Booth Dep. at 15.) We will not second guess a manager who reacts differently when a loss is four times what was originally anticipated. As an alternative, Gliva implores us to find that the Film Group's performance was improving; yet this does not comport with the undisputed facts. Despite recording higher total sales in 2008 than 2007, the Film Group had $187,000 less in sales in the fourth quarter of 2008 as compared to the fourth quarter of 2007—when H. Booth made the decision to reduce expenses. Further, the Group lost $791,000 in 2007, $706,000 in 2008, and $252,000 in the first quarter of 2009. While H. Booth admitted that these numbers indicate that performance was getting a little better, that is not dispositive. The 2009 loss is itself significant when compared to the stated expectations mentioned above and, if annualized, larger than the previous year's losses. Finally, Gliva admits that at the time of his termination PPI closed one of its three branches, terminating four people, and terminated two people (including Gliva) from the remaining branches. (Def.'s Stat. ¶ 63.) With this evidence, Gliva cannot demonstrate that PPI is lying about instituting a RIF.

---

[11] In his brief, Gliva includes these arguments as circumstantial evidence of age discrimination. We find, however, that they are better considered at this stage in the analysis because, even assuming the allegations were correct, they could not lead to an inference of direct discrimination. *See Venturelli v. ARC Commc'n Serv.*, 350 F.3d 592, 601 (7th Cir. 2003) ("Circumstantial evidence under the direct method, however, must allow a jury to infer more than pretext; it must itself show that the decisionmaker acted because of the prohibited animus.").

Gliva also fails to show that he should not have been included in any downsizing. His argument is largely based on having previously received "Good" or "Meets Expectations" performance review ratings and maintaining a good overall sales history. (Resp. at 12.) The inadequacy of this argument is largely demonstrated above in our discussion about meeting PPI's legitimate job expectations. Furthermore, as the Seventh Circuit explained, "even if an employee would not have been fired under normal circumstances, '[i]n a reduction in force, someone has to go. It is usually the least qualified or least productive employee.'" *Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 693 (7th Cir. 2006) (quoting *Fairchild v. Forma Scientific, Inc.*, 147 F.3d 567, 573 (7th Cir. 1998)).

Similarly, his record alone cannot demonstrate that PPI's proffered reasons are a lie. In his memorandum recommending Gliva for termination, Dixon admitted that Gliva had good top-line sales, but based his decision on other factors, including his lack of new customer development and failure to use Goldmine as directed. (Def.'s Stat. ¶ 64.) "[T]he question in a discrimination case is not whether the employer's stated nondiscriminatory ground for the action of which the plaintiff is complaining is correct but whether it is the true ground of the employer's action rather than being a pretext for a decision based on some other, undisclosed ground." *Forrester*, 453 F.3d at 419. By demonstrating that he met some of his employer's expectations, Gliva can only argue that PPI was incorrect to terminate his employment. He cannot demonstrate that PPI was not truthfully relying on different factors.

Gliva further argues that the evaluation method used by Dixon was subjective and deliberately designed so that Malik would "come out on top." (Resp. at 10.) "But use of a subjective, even arbitrary, selection process is not proof of discrimination." *Diettrich v. Nw.*

*Airlines, Inc.*, 168 F.3d 961, 966 (7th Cir. 1999) (citing *Richter*, 142 F.3d at 1031–32); *see also Weihaupt v. Am. Med. Ass'n*, 874 F.2d 419, 429 (7th Cir. 1989) ("The mere fact that [the employer's] beliefs were based on subjective factors fails to establish that their assessment of [Plaintiff's] skills were made in bad faith."); *Dorsch v. L.B. Foster Co.*, 782 F.2d 1421, 1427 (7th Cir. 1986) (A "subjective qualification assessment does not convert an otherwise legitimate reason into an illegitimate one."). Gliva simply argues that Dixon measured Malik differently, giving him credit for experience before joining PPI and creating a "too soon to call" category that only applied to Malik. We cannot infer that this demonstrates "dishonest manipulation" of the assessment, as Gliva claims. Instead, we agree that the record contains enough evidence to support Dixon's belief that Malik would be more valuable to the Group. *See Merillat*, 470 F.3d at 693 n.4.[12]

Gliva does demonstrate that Dixon's proffered reliance on the evaluation changed during the litigation. PPI answered an interrogatory in January 2011 stating: "Dixon used and modified that 9-Block Analysis for the first and only time as a mechanism for assessing and grading the strengths and weaknesses of employees at Defendant's Midwest Films location in making his determination as to which employees would be included in Defendant's reduction-in-force

---

[12] Gliva makes an additional claim that PPI has changed its proffered reason at the summary judgment stage. This argument is based on a false reading of PPI's Memorandum in Support of Motion for Summary Judgment. Gliva argues that PPI now asserts that it hired Malik, over Gliva, because Malik had a background in branch and operations management. (Resp. at 12–13.) This is not the case. In fact, PPI consistently states that Gliva and Malik were not competing for a job. (Reply at 14; Dixon Dep. at 194–95.) Moreover, PPI's reference to Malik's background is in reference to whether or not Malik and Gliva are similarly situated—an issue we do not reach. (Mot. at 9.) Therefore, its inclusion in the brief does not discredit the proffered reason.

conducted in January 10, 2009." (Pl.'s Ex. PPI Supp. Answer to Gliva's Supp. Interrog.) Then, on January 25, 2011, Dixon responded to a deposition question as follows:

> Q: . . . This 9-block analysis on page 1 is something that you decided to use.
> A: I decided to offer [it] to Ms. Awn after the decision was made in the RIF. It was essentially a summary.
> Q: So you are saying you didn't make any RIF choices using the 9-block analysis?
> A: Correct.

(Dixon Dep. at 194.) While this conflicting evidence does evidence an inconsistency, it is not enough to overcome summary judgment. At all times, PPI has consistently maintained that Gliva was subjected to a RIF and that he was chosen because of his poor performance. An inconsistency that draws a distinction between using a specific metric before a decision to determine those to be included in an RIF, or after to justify it to a boss, is not the type of inconsistency that could allow a reasonable person to find PPI's proffered reason unworthy of credence. *See Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007) ("To establish pretext, Boumehdi must identify such weaknesses, implausibilities, inconsistencies, or contradictions in Plastag's proffered reasons that a reasonable person could find them unworthy of credence and hence infer that Plastag did not act for the asserted non-discriminatory reasons." (citing *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 143, 120 S. Ct. 2097, 2106 (2000))).

Finally, while Gliva has successfully raised questions as to the validity of some of the proffered reasons in Dixon's memorandum to Awn, this does not, as Gliva hopes, "permit[] the favorable inference for Gliva that Dixon made some of these up." (Resp. at 12.) At most, Gliva has raised a question as to what comments he made to other managers and coworkers and whether he was told that his performance would not be tolerated and would be reviewed in 60

days. (Pl.'s Resp. to Def.'s 56.1 Stat. ¶ 64.) While we will infer that Dixon's reliance on these alleged statements was incorrect, we cannot infer that he included them in the memorandum in order to conceal discriminatory intent. Gliva has the burden to demonstrate that such reliance was a lie, not merely a mistake. *Forrester*, 453 F.3d at 418 ("[T]he question is never whether the employer was mistaken, . . . or downright irrational in taking the action for the stated reason."). Gliva has not met this burden. We therefore grant summary judgment to PPI.

## CONCLUSION

For the foregoing reasons, we grant Defendant PPI's motion for summary judgment.[13] It is so ordered.

Honorable Marvin E. Aspen
U.S. District Court Judge

Dated: February 23, 2012

---

[13] We also deny Plaintiff Gliva's motions for partial summary judgment, and we overrule Gliva's Rule 72(a) objection and adopt the Magistrate's Report and Recommendation.